OPINION
BERCH, Justice.
¶ 1 This case presents the question whether a radiologist evaluating a chest x-ray for a pre-employment tuberculosis screening owes a duty to the examinee, and, if so, whether the standard of care imposes on the doctor the obligation to take reasonable steps to make known any serious abnormalities he observes.
FACTUAL AND PROCEDURAL BACKGROUND[1]
¶2 Dr. Robert R. McCarver, Jr., a radiologist, evaluated a chest x-ray of nurse Christine Stanley as part of a pre-employment tuberculosis screening. The prospective employer, Mesa Christian Care (“MCC”), contracted with Osborn, Nelson & Carr Portable X-Ray, Inc. (“ONC”), to take the x-ray. Dr. McCarver interpreted the x-ray pursuant to an independent contract with ONC. Dr. McCarver concluded, and wrote in his report, that the x-ray showed abnormalities: a “small nodule overlying the right sixth rib” and a “patchy consolidated parenchymal pattern superimposing the right third rib anteriorly and interspace.” Dr. McCarver sent the report to ONC, which forwarded it to MCC. Although company policy re *221 quired MCC to notify Ms. Stanley of the results within seventy-two hours, MCC apparently did not do so. Approximately ten months later, Ms. Stanley was diagnosed with lung cancer.
¶ 3 Ms. Stanley sued MCC, ONC, and Dr. McCarver, alleging that the Defendants “provided negligent and improper medical care” by failing to “timely and adequately diagnose and/or communicate to [her] the abnormality evident on her chest x-ray.” She implies that she would have had a better chance of recovery had she learned of her cancer sooner and begun treatment earlier.
¶4 MCC declared bankruptcy and was dismissed from the action, and the trial court, relying on Hafner v. Beck, 185 Ariz. 389, 916 P.2d 1105 (App.1995), granted summary judgment to Dr. McCarver and dismissed ONC from the ease. The court of appeals affirmed the order dismissing ONC, but reversed the grant of summary judgment to Dr. McCarver, holding that he did owe a duty to Ms. Stanley. Stanley v. McCarver, 204 Ariz. 339, 345, ¶¶ 21-22, 63 P.3d 1076, 1082 (App.2003). We granted Dr. MeCarver’s petition for review to determine whether he owed a duty to Ms. Stanley under the facts of this case. We have jurisdiction pursuant to Article 6, Section 5(3) of the Arizona Constitution.
DISCUSSION
¶ 5 To maintain this negligence action, Ms. Stanley must show that Dr. McCarver had a legal obligation to protect her from injury or harm — a duty in the parlance of tort law. See Markowitz v. Ariz. Parks Bd., 146 Ariz. 352, 354, 706 P.2d 364, 366 (1985). Whether such a duty exists is a matter of law for this court to determine de novo. Id.
¶ 6 Despite the absence of a doctor-patient relationship between the parties, Ms. Stanley asserts that Dr. McCarver was required to use care and professional skill in reading her x-ray and to reasonably report the results of the x-ray. To determine whether a duty exists, courts examine several sources, including the state’s statutes and controlling cases. Jefferson L. Lankford & Douglas A. Blaze, THE LAW OF NEGLIGENCE IN ARIZONA § 1.02 at 1-2 to 1-3 (3d ed.2003). But no Arizona statute addresses the issue before us and, other than the court of appeals decision in this ease, no reported Arizona opinion has permitted recovery in the circumstances presented here. See Stanley, 204 Ariz. at 345, ¶ 21, 63 P.3d at 1082.
¶ 7 Duties may also arise from a special relationship between the parties, a relationship that may find its basis in contract, family relations, or undertakings. See Hislop v. Salt River Project Agric. Improvement and Power Dist., 197 Ariz. 553, 557, ¶ 21, 5 P.3d 267, 271 (App.2000). In keeping with the contract or “undertaking” bases, the traditional rule has been, as our dissenting colleague correctly notes, that a formal doctor-patient relationship was necessary before tort liability could be imposed for negligent diagnosis or care. See, e.g., Hafner, 185 Ariz. at 391, 916 P.2d at 1107 (finding no duty to claimant given an independent psychological examination for worker’s compensation purposes because there was no doctor-patient relationship); see also Felton v. Schaeffer, 229 Cal.App.3d 229, 279 Cal.Rptr. 713 (1991); Peace v. Weisman, 186 Ga.App. 697, 368 S.E.2d 319 (1988). The requirement of a formal relationship has never been absolute, however. More than a century ago, for example, a Massachusetts court recognized that a doctor’s failure to properly diagnose a patient referred by another could result in liability to the patient for negligence. See Harriott v. Plimpton, 166 Mass. 585, 44 N.E. 992 (1896) (remanding to jury ease of fiancé sent to doctor by future father-in-law to rule out existence of venereal disease; misdiagnosis caused engagement to break up).
¶ 8 The requirement of a formalized relationship between the parties has been quietly eroding in several jurisdictions. See Betesh v. United States, 400 F.Supp. 238, 245-47 (D.D.C.1974); Dyer v. Trachtman, 470 Mich. 45, 679 N.W.2d 311, 314-15 (2004); Reed v. Bojarski, 166 N.J. 89, 764 A.2d 433, 442-43 (2001). It has been eroding in Arizona as well, and, when public policy has supported the existence of a legal obligation, courts have imposed duties for the protection of persons with whom no preexisting “relation *222 ship” existed. E.g., Lombardo v. Albu, 199 Ariz. 97, 99-100, ¶¶ 10-12, 14 P.3d 288, 290-91 (2000) (imposing duty on a purchaser’s real estate agent to deal fairly with sellers); accord Tarasoff v. Bd. of Regents, 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334, 340 (1976) (imposing duty on mental health workers to warn of threat of immediate harm to third party).
¶ 9 Indeed, at least one Arizona case has held that a formal doctor-patient relationship need not exist before a duty may be imposed on the doctor. See Diggs v. Ariz. Cardiologists, Ltd., 198 Ariz. 198, 199, 201, ¶¶ 2, 14, 8 P.3d 386, 387, 389 (App.2000). In Diggs, a cardiologist advised an emergency room doctor regarding Ms. Diggs’ care, knowing that the ER doctor would rely on the advice. Id. at 202-03, ¶¶ 20-23, 8 P.3d at 390-91. In finding that the cardiologist owed Ms. Diggs a duty of reasonable care, the court reasoned that while an “express contractual physician-patient relationship clearly gives rise to a duty to the patient, the absence of such a relationship does not necessarily exclude a duty to the patient.” Id. at 202, ¶ 14, 8 P.3d at 390. We agree.
¶ 10 The parties appear to agree that there was no traditional doctor-patient relationship between them. Nonetheless, Ms. Stanley maintains that a relationship between individuals such as that between herself and Dr. McCarver supports the imposition of a legal obligation to act for the benefit of the examinee. See William L. Prosser, HANDBOOK OF THE LAW OF TORTS § 42, at 244 (4th ed.1971); cf. Betesh, 400 F.Supp. at 245 (noting that “[ejven in the absence of a doctor-patient relationship, a doctor who assumes to act must act carefully with respect to all aspects of the examination”). And in fact this court has recognized that the proper inquiry is whether a sufficient relationship exists between the parties to make it reasonable, as a matter of public policy, to impose a duty. Markowitz, 146 Ariz. at 356, 706 P.2d at 368; see also Green v. Walker, 910 F.2d 291, 296 (5th Cir.1990) (imposing limited doctor-patient relationship to correspond with the extent of the examination).
¶ 11 Although no previous Arizona case has considered the precise issue posed by this case, courts in other states have recognized that liability may be imposed in the absence of a doctor-patient relationship. In Green, 910 F.2d at 296, for example, the Fifth Circuit found, between an employee and the doctor conducting an annual physical, a limited doctor-patient relationship that was sufficient to give rise to a duty of care in conducting the examination and reporting its results. The Ninth Circuit Court of Appeals has similarly recognized an obligation to report abnormal results obtained during a preemployment physical examination, despite the absence of a doctor-patient relationship. Daly v. United States, 946 F.2d 1467, 1468 (9th Cir.1991) (interpreting Washington law); see also Betesh, 400 F.Supp. at 245-47 (holding as a matter of Maryland law that employer-retained radiologists who observed abnormalities owed a duty of care and breached it by failing to notify the examinee); Meena v. Wilburn, 603 So.2d 866, 870 (Miss.1992) (observing that the absence of a doctor-patient relationship is merely one factor in determining the standard of care owed); Reed, 764 A.2d at 443 (finding that the absence of a traditional doctor-patient relationship does not preclude imposing a duty on the examining doctor, the fulfillment of which may require informing the patient of abnormalities); Meinze v. Holmes, 40 Ohio App.3d 143, 532 N.E.2d 170, 173-75 (1987) (containing dictum that insurer-retained doctors had a duty to communicate a significant risk of danger to the plaintiff, even in the absence of a doctor-patient relationship).[2] Although the facts in *223 these cases differ from those at issue before us, all these courts have recognized that in placing oneself in the hands of a medical professional, even at the request of one’s employer or insurer, one may have a reasonable expectation that the “expert will warn of ‘any incidental dangers of which he is cognizant due to his peculiar knowledge of his specialization.’ ” Green, 910 F.2d at 296 (quoting Am. Mfrs. Mut. Ins. Co. v. United Gas Corp., 159 So.2d 592, 595 (La.Ct.App. 1964)).
¶ 12 We find the reasoning in these cases compelling. Many courts treat the existence of a formal doctor-patient relationship as merely one factor to consider in analyzing whether a duty should be imposed. E.g., Meena, 603 So.2d at 870. Such an interpretation comports with Arizona courts’ focus on the sufficiency of the relationship as a basis for imposing a duty. E.g., Markowitz, 146 Ariz. at 356, 706 P.2d at 368. Other courts examine the extent of the relationship and the type of tests conducted by the doctor to determine the extent of the duty, or what we would call the standard of care. E.g., Cleghorn v. Hess, 109 Nev. 544, 853 P.2d 1260, 1263-64 (1993). To determine whether a duty exists, some courts consider such factors as whether the doctor was in a unique position to prevent harm, the burden of preventing harm, whether the plaintiff relied upon the doctor’s diagnosis or interpretation, the closeness of the connection between the defendant’s conduct and the injury suffered, the degree of certainty that the plaintiff has suffered or will suffer harm, the skill or special reputation of the actors, and public policy. E.g., Parsons v. Crown Disposal Co., 15 Cal.4th 456, 63 Cal.Rptr.2d 291, 936 P.2d 70, 80 (1997). These are appropriate inquiries that illuminate the concerns that motivate tort liability.
¶ 13 In the case before us, although there was no traditional doctor-patient relationship between the parties, Dr. McCarver did agree, for consideration, to interpret Ms. Stanley’s confidential medical record, her x-ray, and accurately report the results to ONC. By doing so, he undertook a professional obligation with respect to Ms. Stanley’s physical well being. Having placed himself in such a position, his special skill and training made him aware of abnormalities in the x-ray that one lacking such training could not observe. As a result of his undertaking, Dr. McCarver recognized the existence of abnormalities on the x-ray that may have evidenced an unreasonable risk of harm to Ms. Stanley of which she was unaware. Despite the lack of a traditional doctor-patient relationship, Dr. McCarver should have anticipated that Ms. Stanley would want to know of the potentially life-threatening condition and that not knowing about it could cause her to forgo timely treatment, and he should have acted with reasonable care in light of that knowledge.[3]
¶ 14 By virtue of his undertaking to review Ms. Stanley’s x-ray, Dr. McCarver placed himself in a unique position to prevent future harm to Ms. Stanley. In such a circumstance, an examinee reasonably expects the physician to sound the alarm if any serious abnormality is discovered. Although our dissenting colleague notes that courts in many jurisdictions have not imposed a duty in such situations, see infra ¶ 30, the trend now favors imposing a duty and we can envision no public benefit in encouraging a doctor who has specific individualized knowledge of an examinee’s serious abnormalities to not disclose such information. We conclude that public policy is better served by imposing a duty in such circumstances to help prevent future harm, even in the absence of a traditional doctor-patient relationship.
¶ 15 The imposition of a duty in these circumstances also comports with the Restatement (Second) of Torts § 324A (1965), which Arizona courts have applied in other contexts. See Tollenaar v. Chino Valley Sch. Dist., 190 Ariz. 179, 180, 945 P.2d 1310, 1311 (App.1997); Thompson v. Sun City Cmty. Hosp., 141 Ariz. 597, 608, 688 P.2d 605, 616 (1984) (applying related Restatement § 323). Section 324A suggests imposing a duty on one “who undertakes, gratuitously or for con *224 sideration, to render services to another which he should recognize as necessary for the protection of a third person.” It provides that a person “is subject to liability to the third person ... if (a) his failure to exercise reasonable care increases the risk of ... harm, or ... (c) the harm is suffered because of reliance of ... the third person upon the undertaking.” Restatement, supra, § 324A; see also Dan B. Dobbs, THE LAW OF TORTS §§ 320-21, at 864-73 (2001 & Supp.2003). Dr. MeCarver appears to have undertaken, for consideration, to read Ms. Stanley’s x-ray and to render an opinion on whether the x-ray revealed the presence of tuberculosis. Because this case was decided virtually at the pleading stage,[4] Ms. Stanley has not had the opportunity to show whether Dr. MeCarver’s actions increased the risk of harm to her beyond that which existed in the absence of his undertaking or whether she relied on his undertaking. She should have her day in court to make that showing.
 ¶ 16 Having concluded that a duty exists, we should say what the duty is. As Prosser notes, in negligence cases “the duty is always the same[:] to conform to the legal standard of reasonable conduct in the light of the apparent risk.” Prosser, supra ¶ 10, § 53 at 324. The standard of care imposes on those with special skills or training, however, the higher obligation to act in light of that skill, training, or knowledge,[5] and may be breached either by acts of communication (misfeasance) or omission (nonfeasance). Dr. MeCarver therefore assumed a duty to conform to the legal standard of care for one with his skill, training, and knowledge. As noted in ¶¶ 17 and 19, what is necessary to satisfy the standard will depend upon the facts of each case.
¶ 17 While we agree with the court of appeals that Dr. MeCarver owed a duty of reasonable care to Ms. Stanley, we depart company with respect to that court’s definition of the duty. Relying heavily on the American Medical Association’s Ethical Opinion E-10.03 (June 1999), section V of the Standards of the American College of Radiology (2001) (regarding communication of diagnoses), and section VII(B)(2)(b) of the American College of Radiology’s Standards for the Performance of Screening Mammography (2000), the court of appeals held that a radiologist had a duty to report abnormalities directly to the patient if “there is no referring physician or the referring physician is unavailable.” Stanley, 204 Ariz. at 345, ¶ 20, 63 P.3d at 1082. We decline to find a duty to report directly to the patient based upon the medical profession’s ethical standards because such a notion conflates the existence of a duty with the standard of care.[6] See Markowitz, 146 Ariz. at 356-57, 706 P.2d at 368-69. We do agree with the court of appeals that the duty imposed is to act as a reasonably prudent health care provider in the circumstances. Stanley, 204 Ariz. at 345, ¶ 21, 63 P.3d at 1082. But whether this duty requires direct communication with the subject of the x-ray regarding any abnormalities discovered may depend upon factors such as whether there is a treating or referring phy *225 sician involved in the transaction, whether the radiologist has means to identify and locate the patient, the scope of — including any contractual limitations on — the radiologist’s undertaking, and other factors that may be present in a particular case.
¶ 18 In this case, Ms. Stanley has alleged two breaches of Dr. McCarver’s duties. First, she alleges that he failed to properly interpret the x-ray in question. Yet Dr. McCarver and ONC agree, and Ms. Stanley has not disputed, that Dr. McCarver was an independent contractor, hired only to do a pre-employment screening to rule out the presence of tuberculosis. The record is devoid of evidence that he undertook to diagnose any other conditions that might be ascertainable from the x-ray or had a doctor-patient relationship with Ms. Stanley that would require him to do so. Ms. Stanley agrees that Dr. McCarver observed and reported other abnormalities, such as a “small nodule overlying the right sixth rib” and a “patchy consolidated parenchymal pattern” on the right rib that might indicate the presence of pneumonia scarring or present pneumonia and suggested the need for serial x-rays to determine “stability.” Ms. Stanley complains, however, that Dr. McCarver did not rule out tuberculosis. We fail to see, however, even if that were true, how that failure harms Ms. Stanley, for it is undisputed that she does not have tuberculosis. Therefore, even had Dr. McCarver read the x-ray flawlessly, he would not have observed or reported the presence of tuberculosis.
¶ 19 Second, she alleges that he failed to report the results of the x-ray directly to her. But whether Dr. McCarver acted reasonably by advising ONC of his interpretation of the x-ray is a matter of the standard of care, to be resolved by the trier of fact on remand. The jurors may consider whether MCC’s failure to follow its own policy requiring it to advise Ms. Stanley of the abnormal x-ray comparatively reduces Dr. McCarver’s negligence, if any. And they may consider whether, by notifying ONC, Dr. McCarver discharged his duty by providing notice of his findings reasonably calculated to result in notice to Ms. Stanley. See, e.g., Meinze, 532 N.E.2d at 172 (concluding that a duty to inform was fulfilled when medical reports were sent to patient’s attorney). All we hold today is that a radiologist who interprets a pre-employment x-ray may not necessarily escape liability simply because the subject of the x-ray was not a “patient” in the traditional sense. The discharge of the radiologist’s duty requires the doctor to take reasonable steps appropriate under the circumstances.
¶ 20 Dr. McCarver urges that imposing a duty on radiologists who perform pre-employment interpretations of x-rays will “chill” doctors from doing pre-employment exams and open the floodgates of litigation. We are not persuaded. We suspect, based upon the ethical standards governing radiologists, that most radiologists do in fact communicate with some responsible party when a serious abnormality is discovered. The paucity of case law on this subject further indicates that this is true. It also suggests that the threatened flood of litigation might instead be a trickle. Cf. Union Carbide, 237 F.2d at 232-33 (imposing related duty, but apparently not opening floodgates of litigation). Finally, we note that doctors may deal with this issue as a matter of contract. They may, for example, require x-ray subjects to consent to having the results reported only to the employers.
¶21 In dissent, our colleague expresses concern that the duty the majority recognizes may “subject the doctor to liability in tort for a medical condition that was not caused by negligence of the doctor.” See infra ¶24. Ms. Stanley sues, however, not for her cancer, but for the lost opportunity to treat it. She may not be able to establish that the time between the reading of the x-ray and the discovery of the cancer would have improved her chances of recovery, if indeed she can establish a breach of duty. We do not opine that Dr. McCarver has breached any duty. Rather, that issue is remanded to the jury for determination. We hold only that a doctor who, for consideration, undertakes to read x-rays, on which he observes serious abnormalities, must act reasonably in reading the x-rays and reporting the results.
*226 ¶ 22 We do not impose the duty, as suggested by the dissent, solely because the doctor is in a position to prevent future harm.' Indeed, we recognize that prevention of harm alone will not support the imposition of a duty. See Prosser, supra ¶ 10, § 56 at 340-43 (citations omitted). The duty emanates from the panoply of social concerns that generally inform tort law. See supra ¶¶ 9-12. We simply conclude that the absence of a formal doctor-patient relationship does not necessarily insulate a doctor from liability.[7]
CONCLUSION
¶ 23 We conclude that the absence of a formal doctor-patient relationship does not necessarily preclude the imposition of a duty of care. We affirm that portion of the opinion of the court of appeals imposing a duty, but vacate the remainder of the opinion. We reverse the decision of the trial court and remand the case for further proceedings.
CONCURRING: RUTH V. McGREGOR, Vice Chief Justice, MICHAEL D. RYAN and ANDREW D. HURWITZ, Justices.

. Because this case was decided on summary judgment, we must view the facts in the light most favorable to Ms. Stanley, the non-moving party. Dickey v. City of Flagstaff, 205 Ariz. 1, 2 n. 2, 66 P.3d 44, 45 n. 2 (2003) (citing Orme Sch. v. Reeves, 166 Ariz. 301, 309-10, 802 P.2d 1000, 1008-09 (1990)).

. Other cases suggest such a result as well. E.g., Union Carbide & Carbon Corp. v. Stapleton, 237 F.2d 229 (6th Cir.1956) (interpreting Tennessee law, finding duty by employer); Dornak v. Lafayette Gen. Hosp., 399 So.2d 168 (La.1981) (interpreting civil code); Dyer, 679 N.W.2d at 317 (finding a limited doctor-patient relationship in the context of an independent medical examination for litigation purposes); Cleghorn v. Hess, 109 Nev. 544, 853 P.2d 1260 (1993) (concluding that required pre-employment examination creates a relationship between the doctor and prospective employee, at least to the extent of the tests conducted); Baer v. Bd. of Regents, 118 N.M. 685, 884 P.2d 841 (Ct.App.1994) (remanding for determination whether doctor who found abnormality in course of periodic physical fulfilled his duty to the examinee by referring the patient to his regular physician).

. Because MCC had a policy of advising employee applicants within seventy-two hours of MCC's "receipt of the final results,” Ms. Stanley might reasonably have assumed that, having heard nothing, no threat to her health was revealed by the x-ray.

. Although the case was decided on summary judgment, the only issue presented in that motion was whether Dr. MeCarver owed any duly to Ms. Stanley.

. This standard is supported by Arizona Revised Statutes section 12-563(1) (2003), which provides that, to establish a claim of medical malpractice, a plaintiff must prove that
[t]he health care provider failed to exercise that degree of care, skill and learning expected of a reasonable, prudent health care provider in the profession or class to which he belongs within the state acting in the same or similar circumstances.

. We have similarly declined to use the court’s own ethical standards as a basis upon which to impose legal malpractice liability. Ariz. R. Sup. Ct. 42, R. Prof. Resp., Preamble, Scope ¶20 (noting that rules of professional responsibility “are not designed to be a basis for civil liability"). While rules of professional conduct may provide evidence of how a professional would act, they do not create a duty or establish a standard of care as a matter of law.
The dissent analogizes to a lawyer's ethical duty to report intended criminal conduct that is likely to result in serious bodily harm or death to support the imposition of a duty in Tarasoff. See dissent ¶ 32 (citing Ariz. R. Sup.Ct. 42, ER 1.6). We note, in response, that implying a duty based on the analogous ethical rules for radiologists suggests the imposition of the duty in this case as well. We continue to believe, however, that while such rules may illuminate the standard of care, they do not serve as a basis on which to impose a duty.

. We do not imagine, for example, that if Dr. McCarver falsely told the employer that Ms. Stanley had tuberculosis when she did not, thus denying her employment, or put her confidential medical information on the internet that the absence of a formal doctor-patient relationship would preclude a lawsuit.